UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

AZUKA IWUCHUKWU,

     *Plaintiff*,

   **v.**

ARCHDIOCESE FOR THE MILITARY
SERVICES, *et al.*,

     *Defendants*.

Civil Action No. 21-1980 (FYP)

## <u>MEMORANDUM OPINION</u>

Plaintiff Azuka Iwuchukwu is a former Catholic priest who worked at Georgetown University Hospital and the Department of Veterans Affairs; he brings this suit to seek reinstatement of his ecclesiastical "faculties and endorsement," which authorize him to serve as a priest. Defendants Archdiocese for the Military Services and Archbishop Timothy Broglio revoked Plaintiff's faculties and endorsement after he was accused of sexual abuse by a former patient at Georgetown University Hospital. Plaintiff challenges the decision of the Archdiocese and the Archbishop to deny him restoration of his pastoral privileges. Plaintiff asserts that Defendants violated his rights under the Fourteenth Amendment of the United States Constitution and the D.C. Human Rights Act, D.C. Code § 2-1402.61. Defendants move to dismiss, arguing that the Court lacks subject-matter jurisdiction to hear this case and that the Complaint fails to state a claim upon which relief can be granted. The Court agrees and will grant the Motion to Dismiss.

# BACKGROUND

In 2006, Plaintiff Azuka Iwuchukwu worked at Georgetown University Hospital as a Catholic priest.  *See* ECF No. 1 (Complaint), ¶ 10.  He received authorization to serve in that role from the Archdiocese of Washington, in the form of "faculties" and an "endorsement."[1]  *See* Compl., ¶ 11. "Faculties" confer "religious permission to celebrate Mass and the sacraments in a particular diocese;" and an "endorsement" verifies that a minister "is in good standing with his or her religious community."  *See* ECF No. 13 (Defendants' Motion to Dismiss) at 3 (quotation marks omitted).  In the fall of 2007, Iwuchukwu provided counseling services to J.V., a then 29-year-old patient who had been admitted to the hospital due to her mental illness.  *Id.*, ¶ 12; *see also* Compl., Ex. A (Letter from J.V. to President of Georgetown University Hospital), at ECF p. 12 (describing and commending Iwuchukwu's services during J.V.'s stay).

Iwuchukwu ended his employment at the hospital in 2011 to work at the Department of Veterans Affairs in Delaware.[2]  *See* Compl., ¶ 13.  For this new job, he received faculties and an endorsement to serve as a priest from the Archdiocese for the Military Services ("Archdiocese"). *Id.*, ¶ 14.  In 2012, Iwuchukwu filed a claim against the Department of Veterans Affairs with the Equal Employment Opportunity Commission, alleging discrimination and a hostile work environment.  *Id.*, ¶ 15.

Approximately six years later, on September 11, 2018, Iwuchukwu learned from

---

[1]      Organizations that employ priests rely on ecclesiastical jurisdictions within the Catholic Church, such as the Archdiocese of Washington and the Archdiocese for the Military Services, to certify that clergy are authorized to provide religious services.  *See* Defs. Mot. at 3.

[2]      Plaintiff refers to the "Delaware Department of Veterans Affairs" in his Complaint and briefing.  *See generally* Compl.; ECF No. 16 (Plaintiff's Opposition).  Defendants contend that Iwuchukwu actually worked for the U.S. Department of Veterans Affairs in Delaware.  *See* Defs. Mot. at 4 n.1.  Since this fact is not material to the Court's analysis, the Court will simply refer to Plaintiff's former employer as "the Department of Veterans Affairs."

Archbishop Broglio that J.V. had accused him of sexually abusing her during her stay at Georgetown University Hospital in 2007.  *See id.*, ¶¶ 17, 20.  J.V. alleged that Iwuchukwu sexually abused her at the hospital and at a campground in Erie, Pennsylvania, when Plaintiff visited her family's home.  *Id.*, ¶¶ 17–18; Compl., Ex. B (Polygraph Examination Report from Jeremiah P. Hanafin), at ECF p. 14; *see also* Compl., ¶ 27 (referencing J.V.'s allegations of rape).

In short order, the Archdiocese revoked Iwuchukwu's faculties and endorsement to serve as a priest, despite his protestations that he was innocent.  *See* Compl., ¶¶ 21, 23.  The Archdiocese also reported the allegation of sexual abuse to law enforcement officials in Washington, D.C., and in Pennsylvania.  *Id.*, ¶ 22.  Although neither jurisdiction pursued charges against Iwuchukwu, and Iwuchukwu submitted polygraph results that indicated that his denials of misconduct were true, *id.*, ¶¶ 24–27, Archbishop Broglio declined to reinstate Iwuchukwu's faculties and endorsement.  *Id.*, ¶ 28.  In a letter to Iwuchukwu, the Archbishop expressed concern about the "gravity of the accusations," and noted that the authorities in the District of Columbia and in Pennsylvania "have not declared that [Iwuchukwu is] innocent."  *See* Compl., Ex. C (Letter from Archbishop Broglio to Iwuchukwu, dated Oct. 15, 2019), at ECF p. 18. Further, the Archbishop stated his belief that the "authorities have not, and likely will not, investigate the PA/Georgetown allegations because the statutes of limitations in both jurisdictions have run out."  *Id.*  Because the Archbishop declined to restore Iwuchukwu's faculties and endorsement, he "lost his employment with the . . . Department of Veterans Affairs," and "has been unable to obtain employment as a Catholic Priest."  *See* Compl., ¶¶ 30–31.

On July 21, 2021, Iwuchukwu filed suit against the Archdiocese and Archbishop Broglio in this Court.  *See generally* Compl.  In his Complaint, Iwuchukwu alleges (1) that the Archbishop's decision not to reinstate his faculties and endorsement deprived him of a property right without due process of law, in violation of the Fourteenth Amendment, *see id.*, ¶¶ 32–36; (2) that the Archbishop's decision constituted retaliation against him for filing an employment-discrimination claim against the Department of Veterans Affairs, in violation of the D.C. Human Rights Act ("DCHRA"), *id.*, ¶¶ 37–40 (citing D.C. Code § 2-1402.61); and (3) that the Archdiocese is liable for the Archbishop's actions under the doctrine of *respondeat superior*, *id.* ¶¶ 41–43.  As recompense for these alleged wrongs, Iwuchukwu seeks reinstatement of his faculties and endorsement, compensatory and punitive damages, and attorney's fees.  *See id.*, ¶¶ 36, 40, 43.  On October 1, 2021, Defendants moved to dismiss the Complaint under both Rule 12(b)(1) and Rule 12(b)(6) of the Federal Rules of Civil Procedure, arguing that the Court lacks subject-matter jurisdiction, and that Iwuchukwu has failed to state claims upon which relief can be granted.  *See generally* Defs. Mot.

## LEGAL STANDARD

### I.    Subject-Matter Jurisdiction

When a defendant brings a Rule 12(b)(1) motion to dismiss, the plaintiff must demonstrate by a preponderance of the evidence that the court has subject-matter jurisdiction to hear his claims.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992); *U.S. Ecology, Inc. v. U.S. Dep't of Interior*, 231 F.3d 20, 24 (D.C. Cir. 2000).  "Because subject-matter jurisdiction focuses on the court's power to hear the plaintiff's claim, a Rule 12(b)(1) motion imposes on the court an affirmative obligation to ensure that it is acting within the scope of its jurisdictional

authority." *Grand Lodge of Fraternal Order of Police v. Ashcroft*, 185 F. Supp. 2d 9, 13 (D.D.C. 2001).  As a result, "the plaintiff's factual allegations in the complaint . . . will bear closer scrutiny in resolving a 12(b)(1) motion than in resolving a 12(b)(6) motion for failure to state a claim." *Id.* at 13–14 (cleaned up).

In policing its jurisdictional bounds, the court must scrutinize the complaint, treating its factual allegations as true and granting the plaintiff the benefit of all reasonable inferences that can be derived from the alleged facts.  *See Jerome Stevens Pharms., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005).  The court, however, need not rely "on the complaint standing alone," as it may also look to undisputed facts in the record or resolve disputed ones.  *See Herbert v. Nat'l Acad. of Sci.*, 974 F.2d 192, 197 (D.C. Cir. 1992) (citations omitted).  By considering documents outside the pleadings on a Rule 12(b)(1) motion, a court does not convert the motion into one for summary judgment, as "the plain language of Rule 12(b) permits *only* a 12(b)(6) motion to be converted into a motion for summary judgment" when a court considers documents extraneous to the pleadings.  *Haase v. Sessions*, 835 F.2d 902, 905 (D.C. Cir. 1987) (emphasis in original).

## II.   Failure to State a Claim

To survive a motion to dismiss under Rule 12(b)(6), a complaint must "state a claim upon which relief can be granted."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 552 (2007). Although "detailed factual allegations" are not necessary to withstand a Rule 12(b)(6) motion, *id.* at 555, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).  A plaintiff may survive a Rule 12(b)(6) motion even if "'recovery is very remote and unlikely,'" but the facts alleged in the complaint "must be enough

to raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555–56

(quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

## ANALYSIS

### I.    Lack of Subject-Matter Jurisdiction

Defendants first argue that the ecclesiastical abstention doctrine bars the Court from

reviewing the Archbishop's decision to withhold Iwuchukwu's religious faculties and

endorsement.  *See* Defs. Mot. at 8–11.  The Court will analyze this argument under Rule

12(b)(1), as "that approach is consistent with the long-standing practice of treating questions of

ecclesiastical entanglement as jurisdictional."  *Gregorio v. Hoover*, 238 F. Supp. 3d 37, 46

(D.D.C. 2017).

The ecclesiastical abstention doctrine is grounded in the First Amendment, which

instructs that "Congress shall make no law respecting an establishment of religion, or prohibiting

the free exercise thereof."  *See* U.S. Const., amend. I.  The First Amendment's two clauses

concerning religion provide dual protections to ensure that churches can freely determine the

composition of their clergy:  "The Establishment Clause prevents the Government from

appointing ministers, and the Free Exercise Clause prevents it from interfering with the freedom

of religious groups to select their own."  *Hosanna-Tabor Evangelical Lutheran Church & School*

*v. EEOC*, 565 U.S. 171, 184 (2012).  Drawing on the Free Exercise Clause, "a long line of

Supreme Court cases [have] affirm[ed] the fundamental right of churches to 'decide for

themselves, free from state interference, matters of church government.'"  *EEOC v. Catholic*

*Univ. of Am.*, 83 F.3d 455, 462 (D.C. Cir. 1996) (quoting *Kedroff v. St. Nicholas Cathedral of*

*Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952)).

Under the ecclesiastical abstention doctrine, courts are forbidden from reviewing decisions involving "matters of church government as well as those of faith and doctrine." *EEOC v. Catholic Univ. of Am.*, 83 F.3d at 462; *accord Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 713–15 (1976).  Thus, "whenever . . . questions of discipline, or of faith, or ecclesiastical rule, custom, or law have been decided by . . . church judicatories . . . , the legal tribunals must accept such decisions as final, and as binding on them, in their application to the case before them."  *Serbian E. Orthodox Diocese*, 426 U.S. at 710 (quoting *Watson v. Jones*, 13 Wall 679, 727 (1872)).  As a result, "the role of civil courts in the resolution of religious controversies that incidentally affect civil rights" is "limit[ed]."  *Id.* at 710.  The Supreme Court has justified the ecclesiastical abstention doctrine by noting that "if anyone aggrieved by [a church's] decisions could appeal to the secular courts and have them reversed," the "total subversion of such religious bodies" would result.  *See id.* at 711 (quoting *Watson v. Jones*, 13 Wall at 728–29); *see also id.* at 709 (warning that allowing judicial review would create "substantial danger that the State will become entangled in essentially religious controversies or intervene on behalf of groups espousing particular doctrinal beliefs").

Among the matters that the ecclesiastical abstention doctrine shields from judicial review is a religious organization's "determination of whose voice speaks for the church."  *Minker v. Baltimore Annual Conference of United Methodist Church*, 894 F.2d 1354, 1356 (D.C. Cir. 1990) (cleaned up) (refusing to consider plaintiff's age discrimination claims due to abstention doctrine).  The D.C. Circuit has made clear that a church's choice of clergy "is *per se* a religious matter," *id.*, and "courts have refused to interfere with the basic ecclesiastical decision of choosing the minister or priest of a church."  *Burgess v. Rock Creek Baptist Church*, 734 F.

Supp. 30, 33 (D.D.C. 1990) (citations omitted).

In the instant case, Iwuchukwu challenges the Archdiocese's denial of his faculties and endorsement; and he asks the Court to order that his pastoral privileges be reinstated.  *See* Compl., ¶¶ 1, 36, 40, 43.  But when Archbishop Broglio declined to reinstate Iwuchukwu's privileges, the Archbishop determined that Iwuchukwu could not speak for the church.  *See Minker v. Baltimore Annual Conference of United Methodist Church*, 894 F.2d at 1356.  This decision reflected the Archbishop's concern about the cloud of possible criminal conduct cast by J.V.'s sexual abuse allegations, which were never resolved by any official investigation.  *See* Letter from Archbishop Broglio to Iwuchukwu, at ECF p. 18.  Such a judgment by a church leader plainly concerns the composition of the clergy and a matter of church discipline — issues that are "at the core of ecclesiastical concern."  *Serbian E. Orthodox Diocese*, 426 U.S. at 717; *see Minker v. Baltimore Annual Conference of United Methodist Church*, 894 F.2d at 1356; *Burgess v. Rock Creek Baptist Church*, 734 F. Supp. at 33.

Moreover, the conferral of faculties and an endorsement on a priest is a purely religious decision that cannot be reviewed by courts.  *See Serbian E. Orthodox Diocese*, 426 U.S. at 710. Faculties are the "means by which the . . . archbishop, confers permission to a visiting priest . . . to hear confessions, say Mass, preach, and administer the sacraments of the Roman Catholic Church."  *Bouchard v. New York Archdiocese*, No. 04-cv-9978, 2007 WL 2728666, at *4 n.2 (S.D.N.Y. Sept. 19, 2007).  Similarly, those seeking the church's endorsement are requesting the church's approval "to take [the] position of a Catholic chaplain," *Turner v. Parsons*, 620 F. Supp. 138, 142 (E.D. Pa. 1985); and such a request requires the church to determine whether the candidate is "in good standing with the faith group or denomination" and "is qualified to perform

8

the full range of ministry, including all sacraments, rites, ordinances, rituals and liturgies required by members of the faith group." *See* Department of Veterans Affairs, VHA Directive 1111, § 3(c) (July 21, 2021).[3]  The Court is not able to review such questions of "ecclesiastical cognizance." *Serbian E. Orthodox Diocese*, 426 U.S. at 710; *see id.* at 717–18; *see also Watson v. Jones*, 80 U.S. at 729 ("It is not to be supposed that the judges of the civil courts can be as competent in the ecclesiastical law and religious faith of all these bodies as the ablest men in each are in reference to their own.").

  Contrary to Plaintiff's contention, the Court cannot hear his claim merely because he was denied his faculties and endorsement due to "alleged sexual abuse" instead of strictly "religious reasons." *See* ECF No. 16 (Plaintiff's Opposition) at 14.  Although it is true that J.V.'s unresolved accusations are not necessarily a matter of religion, the Archbishop's motivations and decision-making process in this realm are entirely insulated from judicial review. *See Pardue v. Center City Consortium Schools of Archdiocese of Washington, Inc.*, 875 A.2d 669, 674–75 (D.C. 2005) ("[E]valuation [by the court] would require the very inquiry into the Archdiocese's motivation that the Free Exercise Clause forbids."); *see also NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 502 (1979) ("It is not only the conclusions that may be reached . . . which may impinge on rights guaranteed by the Religion Clauses, but also the very process of inquiry" into "the good faith of the position asserted by the clergy[] . . . .").  Plaintiff here asks the Court to undertake an inquiry that falls squarely within the ambit of the

---

[3] When analyzing questions of jurisdiction, courts may consider documents outside the pleadings. *See Herbert v. Nat'l Acad. of Sci.*, 974 F.2d at 197.  Its decision to look beyond the complaint does not convert a motion to dismiss under Rule 12(b)(1) into a motion for summary judgment. *See Haase v. Sessions*, 835 F.2d at 905 (stating that "the plain language of Rule 12(b) permits only a 12(b)(6) motion to be converted into a motion for summary judgment" when a court considers documents extraneous to the pleadings).

ecclesiastical abstention doctrine.  The Court lacks jurisdiction to hear the issues in this case and must grant Defendants' Motion to Dismiss.[4]

## II.      Failure to State a Claim

Even if the Court had jurisdiction over Iwuchukwu's case, his claims still could not survive Defendants' Motion to Dismiss.  Iwuchukwu alleges claims under the Fourteenth Amendment, the DCHRA, and the doctrine of *respondeat superior*.  *See* Compl., ¶¶ 32–43.  But his allegations fail to satisfy key elements of each cause of action.

Iwuchukwu's constitutional claim falters at the outset, as Iwuchukwu does not challenge state action.  As its text clearly states, the Fourteenth Amendment protects individuals only from the conduct of state actors.  *See* U.S. Const., amend. XIV ("*No State* shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; *nor shall any State* deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.") (emphasis added); *United States v. Morrison*, 529 U.S. 598, 621 (2000) (stating the "time-honored principle that the Fourteenth Amendment, by its very terms, prohibits only state action").  Because the Fourteenth Amendment offers no relief for acts perpetrated by private parties, Iwuchukwu's contention that the Archbishop, a private actor, deprived him of a property right without due process of law fails

---

[4]      Defendants also argue that Plaintiff's claims and request for damages are foreclosed by the ministerial exception, a related doctrine that bars judicial inquiry into employment relationships between religious organizations and their ministers.  *See* Defs. Mot. at 11–14; *Hosanna-Tabor*, 565 U.S. at 188; *see also Our Lady of Guadalupe School v. Morrissey-Berru*, 140 S. Ct. 2049, 2060 (2020) ("[C]ourts are bound to stay out of employment disputes involving those holding certain important positions with churches and other religious institutions."); *EEOC v. Catholic University of America*, 83 F.3d 455, 461 (D.C. Cir. 1996) (holding that the Free Exercise Clause "precludes civil courts from adjudicating employment discrimination suits by ministers against the church or religious institution employing them").  Because the ministerial exception applies to employment disputes, and Iwuchukwu was not employed by the Archdiocese, *see* Compl., ¶ 3; Defs. Mot. at 15, the Court concludes that ecclesiastical abstention provides the more suitable ground on which to decide the Motion.

to state a claim.[5]

Plaintiff's retaliation claim under the DCHRA fares no better.  Iwuchukwu alleges that

Defendants retaliated against him for filing a complaint with the EEOC, relying on D.C. Code

§ 2-1402.61.  That provision states:

> It shall be an unlawful discriminatory practice to coerce, threaten, retaliate
> against, or interfere with any person in the exercise or enjoyment of, or on
> account of having exercised or enjoyed, or on account of having aided or
> encouraged any other person in the exercise or enjoyment of any right
> granted or protected under this chapter.

*See* D.C. Code § 2-1402.61.  The DCHRA, however, also contains an exception for religious

organizations.  In Section 1401.03(b), the DCHRA provides:

> Nothing in this chapter shall be construed to bar any religious or political
> organization . . . from limiting employment, or admission to or giving
> preference to persons of the same religion or political persuasion as is
> calculated by the organization to promote the religious or political
> principles for which it is established or maintained.

*See id.* § 2-1401.03(b).  In his letter to Iwuchukwu, Archbishop Broglio stated that he "must

come to th[e] conclusion" to decline to restore Plaintiff's faculties and endorsement based on

"the gravity of the accusations," and noted that the matter "is governed by the essential norms

and the Dallas Charter."  *See* Letter from Archbishop Broglio to Iwuchukwu, at ECF p. 18

(referencing policies established by the United States Conference of Catholic Bishops that

---

[5]        Furthermore, Iwuchukwu lacks a property right that would be protected by the Due Process Clause.  The
Supreme Court has stated that a property interest in employment is created not by the Constitution but "by existing
rules or understandings that stem from an independent source such as state law — rules or understandings that
secure certain benefits and that support claims of entitlement to those benefits."  *Bd. of Regents of State Colleges v.
Roth*, 408 U.S. 564, 577 (1972); *see also Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538–39 (1985)
(holding that respondents had property interest only because Ohio statute provided for civil service protections).
Plaintiff has not identified any source of law that protects his receipt of faculties and an endorsement from the
Archdiocese.  Rather, the Archdiocese had "no obligation to grant endorsement or faculties to a priest."  *See* Letter
from Archbishop Broglio to Iwuchukwu, at ECF p. 18; *see also* Defs. Mot. at 8 ("[T]he correspondence with the
Archdiocese and Archbishop appended to Plaintiff's complaint confirms that the act was discretionary.").

govern the handling of sexual-abuse allegations).  The Archbishop's decision thus relied on the

Catholic Church's internal policies, and it therefore falls under the DCHRA's exception that

allows a religious organization to "limit admission" in order "to promote the religious . . .

principles for which it is established or maintained."[6]  *See* D.C. Code § 1401.03(b).  As a result,

Plaintiff fails to state a viable claim under the DCHRA.

Iwuchukwu's final claim seeks to hold the Archdiocese liable for the Archbishop's acts

under the doctrine of *respondeat superior.*  *See* Compl., ¶¶ 41–43.  This claim cannot survive

because Plaintiff has failed to plead a tortious act by the Archbishop for which the Archdiocese

could be liable.  "'*Respondeat superior*' is not an independent tort claim, but rather a legal theory

of vicarious liability that transfers liability from an agent to its principals."  *Simmons v. Skelonc*,

No. 20-2845, 2021 WL 3207042, at *7 (D.D.C. July 29, 2021) (citations omitted); *see also*

*Convit v. Wilson*, 980 A.2d 1104, 1114 (D.C. 2009) ("Vicarious liability . . . is merely a legal

concept used to transfer liability from an agent to a principal and includes the theory of

*respondeat superior* as developed in agency law.").  Without an underlying tort, Iwuchukwu's

invocation of *respondeat superior* does not state a claim upon which relief can be granted; it

therefore must be dismissed.  *See* Compl., ¶¶ 41–43; Defs. Mot. at 17.

### III.    Amendment of Complaint

Anticipating the dismissal of his claims, Iwuchukwu requests leave to file an amended

complaint.  *See* Pl. Opp. at 18–19.  Under Federal Rule of Civil Procedure 15(a)(2), "leave to

amend should be freely given unless there is a good reason, such as futility, to the contrary."

---

[6]      Defendants also argue that Iwuchukwu has failed to allege a protected activity and a causal connection between the protected activity and adverse action.  *See* Defs. Mot. at 15; *see also Vogel v. D.C. Office of Planning*, 944 A.2d 456, 463 (D.C. 2008) (stating elements of retaliation claim).  The Court need not assess Plaintiff's prima facie case since his claim falls under the DCHRA's religious exemption.

*Willoughby v. Potomac Elec. Power Co.*, 100 F.3d 999, 1003 (D.C. Cir. 1996) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)); *see also* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave when justice so requires.").  A district court has discretion to "deny a motion to amend a complaint as futile if the proposed claim would not survive a motion to dismiss." *Hettinga v. United States*, 677 F.3d 471, 480 (D.C. Cir. 2012) (citing *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1099 (D.C. Cir. 1996)); *see also Willoughby*, 100 F.3d at 1003 (deeming amendment futile when plaintiff's proposed filing stood "little chance" of making out "a successful . . . claim").

In this case, granting leave to amend would be futile, as Iwuchukwu cannot plead facts that would clear the jurisdictional bar of the ecclesiastical abstention doctrine.  At bottom, he is challenging the decision of his church's governing body to deny him authorization to serve as a Catholic priest.  As discussed, *supra*, judicial review of such a decision is strictly prohibited, and any attempt to amend Plaintiff's pleading would be futile.  Iwuchukwu's request for leave to amend his Complaint is therefore denied.

## CONCLUSION

For the foregoing reasons, the Court will grant Defendants' Motion to Dismiss and deny Plaintiff's request for leave to file an amended complaint.  A separate Order will issue this day.

_____
FLORENCE Y. PAN
United States District Judge

Date:   February 11, 2022

13